OPINION
Defendant-appellant, Dennis Evans, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of one count of murder in violation of former R.C. 2903.02, with a firearm specification under R.C. 2941.141.
According to the state's evidence, in the late afternoon of May 7, 1993, Phillip Staples, Sr. was shot while he grilled food for a family birthday party in the backyard of an apartment complex on South Champion Avenue in Columbus, Ohio. At the time of the shooting, approximately ten to fifteen small children and five adults were in the backyard. According to Sonya Jones, whom Staples was living with at the time, Jones heard approximately four pops that sounded like firecrackers that came from the direction of a carwash near Livingston Avenue. Staples then fell at Jones' feet and was unresponsive. Jones later observed a puddle forming on Staples' shirt, and foam forming in his mouth. After a period of confusion, police and emergency medical staff were summoned. Staples died from his injuries; a nine-millimeter bullet was recovered from Staples' body.
Police searched the nearby area and found two nine-millimeter shell casings in the parking lot of Reeb's restaurant, south of the shooting location. Police also discovered evidence that a bullet penetrated a food trailer located in a northerly direction from the parking lot, exited the trailer, penetrated a wood fence, and then entered Staples' backyard before striking Staples.
Police canvassed the neighborhood to identify anybody with information about the shooting. On the day following the shooting, police interviewed Curtis Williams. At trial, Williams testified that on May 7, 1993 at around 5:00 p.m., he was talking with the brother of his former girlfriend as he stood in the doorway of a South Champion Avenue apartment, when he heard four or five gunshots. He looked up and saw two men shooting chrome-colored automatic guns in a northerly direction from the parking lot of a record shop near Reeb's restaurant. Williams recognized the men as "Dennis" and Dennis' friend. Dennis was someone Williams knew from the neighborhood, but he and Dennis were not friends. After firing their weapons, "Dennis" and his companion hopped in a blue convertible. As Dennis and his companion fled, they were followed by another car, a light blue Cadillac. At trial, Williams described the appearance of the person that he identified as Dennis, but Williams was not able to identify defendant in the courtroom. Williams also admitted that he was a convicted felon, having been convicted of attempted drug trafficking in 1995.
Based on information from Williams and other information that police collected, police searched a residence at 1163 Kelton Avenue. Police found a blue convertible parked near the residence and recovered defendant's latent fingerprints from the vehicle. From a northwest bedroom in the residence, police found an insurance card in defendant's name, a notice of a hospital plan policy in defendant's name, and a gun magazine for a Glock pistol. From the living room of the residence, police recovered a vehicle title in defendant's name and miscellaneous papers with other persons' names on them. From a closet in the living room, police recovered a safe. In opening the safe, police discovered a plastic box for a Glock 17, nine-millimeter PARA handgun. A handwritten rap song with violent and racist lyrics was also recovered from the residence.
In October 1998, police interviewed Lee Gill, who was incarcerated in federal prison on federal drug charges, about the shooting of Staples in 1993. Gill informed police that defendant shot Staples, but Gill failed to disclose that he was present at the time of the shooting. In February 1999, Gill contacted police to fully disclose information about the shooting. In exchange for Gill's trial testimony and cooperation, the prosecution agreed to write a letter to the United States Attorney for the purpose of attempting to reduce Gill's federal sentence.
At trial, Gill testified that in 1993, he and defendant were members of a street gang named the GI Boys. On May 7, 1993, Gill received a page from defendant who wanted to purchase drugs from Gill. Gill met defendant and another gang member, William Hubbard, in a parking lot near the intersection of Champion and Livingston. Gill parked his car and walked toward defendant. Gill then heard defendant yell that he saw members of a rival gang, the Detroit Boys. At the time, the GI Boys and the Detroit Boys were "beefing." Because Gill did not have his gun on his person, Gill went toward his car to retrieve his weapon. While heading for his car, Gill heard shots. When Gill turned around, he observed defendant kneeling down and shooting what Gill believed to be a black Glock pistol. Gill did not remember whether Hubbard was shooting. After the shooting stopped, defendant and Hubbard left the scene. Gill left separately.
According to Gill, later that day, after Staples' death had been reported by the news media, defendant met with Gill. Defendant informed Gill he planned to dispose of his weapon and, at that time, he was staying at the Kelton Avenue address.
Gill also testified that since his incarceration in federal prison, he had received letters from defendant. In 1998 before Gill spoke with police about the shooting, Gill received a letter that he believed defendant sent because it was signed using defendant's street name. The letter's author wrote, "People say you are telling on us. How true is that? Said you was going to start telling them about bodies. How true is that? * * * Straighten out all these rumors for me. I don't believe this about a real G. Get back with me." (Tr. 209.)
DiAngelo Gray, a convicted felon who is incarcerated in federal prison for conspiracy to distribute crack, testified that on May 7, 1993, he was selling drugs in a parking lot near Reeb's restaurant when the shooting occurred. Just before the shooting, Gray heard someone yelling, "[t]here they go." Looking up, Gray saw defendant shooting twice across Livingston Avenue at what Gray believed was a red car. Defendant then entered a blue car by himself, sped away, and fired a couple more shots toward the red car. William Turner, another gang member, sped away in a gold-colored car. The next morning Gray met with defendant. According to Gray, defendant appeared shaken. Defendant claimed that he did not intend to shoot the man and stated he "didn't even get those bitch ass niggers." (Tr. 237.) Gray testified that the weapon defendant used was chrome in color, and defendant usually carried a .38 caliber handgun. In exchange for Gray's trial testimony and cooperation, the prosecution agreed to write a letter to the United States Attorney for the purpose of attempting to reduce Gray's federal sentence.
Although he was ordered by the trial court to submit a handwriting exemplar, defendant refused. Consequently, a police handwriting expert examined the 1998 letter that Gill received in prison and the rap song that was recovered from the residence on Kelton Avenue. The handwriting expert concluded the handwriting in both documents was similar, but he could not conclude within a reasonable degree of scientific certainty that the handwriting samples were written by the same person.
By indictment filed September 10, 1999, defendant was charged with one count of murder with a firearm specification, and one count of having a weapon while under disability. The charge of having a weapon while under disability was later dismissed following a motion of nolle prosequi by the prosecution. A jury trial was held and the jury found defendant guilty of murder and the accompanying firearm specification. The trial court sentenced defendant and ordered the sentence to be served consecutively to a federal sentence defendant was already serving.
Defendant timely appeals, and assigns five errors:
 FIRST ASSIGNMENT OF ERROR The trial court erred in admitting an empty handgun box and a gun magazine, purportedly possessed by Appellant, in the absence of sufficient evidence to establish Appellant's ownership of the items and in violation of Evid. R. 403(A).
 SECOND ASSIGNMENT OF ERROR The trial court erred in admitting documents containing unfairly prejudicial and highly inflammatory material in violation of the Rules of Evidence and the due process clauses under the state and federal Constitutions.
 THIRD ASSIGNMENT OF ERROR The trial court erred in instructing the jury that it could infer that Appellant intended to purposely kill another from the use of a deadly weapon, under circumstances which violated Appellant's due process protections under the state and federal Constitutions.
 FOURTH ASSIGNMENT OF ERROR There was insufficient evidence to establish that Appellant acted purposely, as defined in R.C. 2901.22(A).
 FIFTH ASSIGNMENT OF ERROR The trial court erred in imposing consecutive terms of incarceration.
In his first assignment of error, defendant contends the trial court erred by admitting an empty handgun box and gun magazine in the absence of sufficient evidence to establish defendant's ownership of these items.
"The trial court has broad discretion in the admission and exclusion of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere". State v. Hymore (1967), 9 Ohio St.2d 122, 128. An "* * * `abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v. Adams (1980), 62 Ohio St.2d 151, 157.
Both the empty Glock handgun box and Glock magazine were recovered from the Kelton Avenue dwelling to which defendant was linked by other evidence. Whether the Kelton Avenue dwelling was defendant's legal residence or whether defendant simply used it several nights after the shooting is immaterial. Persuasive evidence establishes defendant used it based on the presence of defendant's insurance card, notice of hospital plan policy in defendant's name, defendant's vehicle title that was recovered from the Kelton Avenue residence, the fact that defendant's car was parked near the Kelton Avenue residence, and testimony from Gill that defendant stayed there at or about the time of the shooting. Although evidence introduced at trial does not contain any fingerprint evidence that links defendant to the recovered Glock handgun box and Glock magazine, the foregoing creates a sufficient nexus to connect defendant to the Kelton Avenue dwelling.
Moreover, the evidence serves to resolve conflicting evidence concerning defendant's role in the shooting and the weapon he used. Gill testified defendant fired a weapon that he believed to be a black Glock pistol. Gill was unsure whether Hubbard, whom Gill identified as being with defendant at the time of the incident, was shooting at the time of the incident. Gray testified defendant was the only person he saw shooting at the time of the incident; Williams testified that another person was shooting in addition to defendant. See State v. Brown (May 19, 1992), Franklin App. No. 91AP-1114, unreported, dismissed, jurisdictional motion overruled, 65 Ohio St.3d 1440 ("The weight to be given to the testimony of witnesses does not depend upon the number of witnesses, but on the impression which their testimony makes on the jury"). Given the various accounts, the evidence tended to corroborate Gill's testimony. Indeed, the jury apparently found the testimony of Gill and Gray to be persuasive.
Unpersuasive is defendant's contention that the probative value of the Glock handgun magazine was substantially outweighed by the danger of unfair prejudice under Evid.R. 403(A) and by this court's holding in State v. Parrish (1991), 71 Ohio App.3d 659, dismissed, jurisdictional motion overruled, 60 Ohio St.3d 718 . Defendant contends Parrish stands for the proposition that "* * * it was error for a trial court to allow weapons seized from a defendant's home to be introduced where those weapons were not involved in the commission of the charged offense." (Defendant's Brief, 13.) Defendant's interpretation of Parrish is overly broad.
In Parrish, this court found the introduction of evidence concerning weapons recovered from the appellant two months after a victim's death was prejudicial to the appellant. The time frame in Parrish was critical to the determination of the relevancy of the evidence: "[h]ad the evidence shown that appellant possessed firearms within a couple of weeks immediately prior to or immediately after the victim was shot, the evidence may have been relevant to have shown that the appellant had the opportunity to possess firearms. However, the evidence introduced by the prosecution was not relevant because of the time frame and did not meet the requirements enumerated in Evid.R. 404(B) or R.C. 2945.59 when such are strictly construed." Id. at 666.
Here, the temporal delay in the recovery of relevant evidence is distinguishable from that in Parrish. Two days after the incident, not two months as in Parrish, police recovered a Glock magazine from the Kelton Avenue dwelling to which defendant had been linked. Because a Glock magazine was recovered two days after the shooting from a dwelling to which defendant had been linked, the evidence is admissible to show that defendant had the opportunity to possess a Glock firearm. The probative value of the recovered Glock magazine was not substantially outweighed by the danger of unfair prejudice under Evid.R. 403(A). Accordingly, defendant's first assignment of error is overruled.
Defendant's second assignment of error contends the trial court violated due process and the Ohio Rules of Evidence by admitting documents that contained unfairly prejudicial and highly inflammatory material.
As a preliminary matter, we note defendant's refusal to comply with the trial court's order for a handwriting exemplar contributed to the trial court's admission of the documents of which defendant complains. Pursuant to the trial court's order to defendant to provide handwriting exemplars to the prosecution, the prosecution's handwriting expert on three occasions attempted to obtain the exemplars from defendant. At the first attempt, defendant declined because he wanted to speak with his attorney before providing the exemplars. After the expert understood from defense counsel that defendant would provide the exemplars, defendant refused to provide the handwriting exemplars a second time. Finally, the expert attempted to obtain the handwriting exemplars ten minutes before testifying in court, but defendant still refused to provide the handwriting exemplars.
Consequently, for the purpose of handwriting comparison, the trial court admitted over defense objections, a letter sent to Gill, signed with defendant's street name, and a rap poem with violent and profane lyrics that was recovered from the dwelling on Kelton Avenue. The rap poem included references to a "Glock-nina" and a homicide. The trial court instructed the jury to disregard the contents of the rap poem and emphasized the poem was offered into evidence only for the purpose of handwriting comparison.
Defendant contends the trial court erred in admitting the documents for three separate reasons: (1) the admission of the documents violated Evid.R. 404(B), (2) the admission of the documents violated Evid.R. 403(A), and (3) the admission of these documents required the jury to impermissibly draw an inference from an inference.
Evid.R. 404(B) prohibits the introduction of evidence of other crimes, wrongs or acts "* * * to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Here, the trial court admitted the documents for the purpose of handwriting comparison only so that the identity of the documents' author could be determined. The trial court did not admit the documents as evidence of other crimes or wrongs, nor did it admit the documents to show that defendant acted in conformity therewith. Indeed, the trial court specifically instructed the jury to disregard the contents of the rap poem. Because the trial court admitted the documents for the purpose of establishing the identity of the author of the documents, the trial court did not violate Evid.R. 404(B).
Defendant's argument that the probative value of the evidence is outweighed by the danger of unfair prejudice under Evid.R. 403(A) also lacks merit. Instructive is the Supreme Court's opinion in State v. Coleman (1989), 45 Ohio St.3d 298, certiorari denied (1990), 493 U.S. 1051, where Coleman refused to provide uppercase handwriting exemplars when requested. Quoting United States v. Johnston (C.A.7, 1982), 690 F.2d 638,646, the Ohio Supreme Court in Coleman noted, "where the defendant attempts to take advantage of a situation that was his own doing, not the government's, the government, by the only means at its disposal, should be permitted to fully attempt to thwart suppression and to impeach the defendant." Coleman, supra, at 302.
In State v. Ostrowski (1972), 30 Ohio St.2d 34, paragraph one of the syllabus, certiorari denied, 409 U.S. 890, the Ohio Supreme Court determined, "A handwriting exemplar, used solely for identification purposes, is a mere identifying physical characteristic and, as such, is outside the scope of the Fifth Amendment privilege against self-incrimination, even if the words written are identical to the words contained in a writing directly linked to the crime * * *." The record reveals no reason for defendant's refusal to comply with the trial court, nor does defendant offer any rationale in his brief on appeal. As a result, defendant's contention concerning unfair prejudice to some extent is disingenuous. Assuming admission of the rap poem with its equivocal references to a "Glock-nina" and a homicide was prejudicial, its probative value was not substantially outweighed by the danger of unfair prejudice, given the circumstances that prompted its admission. Moreover, the trial court's instruction to the jury to disregard the contents of the poem reduced the danger of confusing the issues or of misleading the jury. Evid.R. 403(A).
Relying on Hurt v. Charles J. Rogers Transp. Co. (1955),164 Ohio St. 329, defendant lastly contends the foundation for the rap poem's admission into evidence impermissibly was based on an inference drawn from an inference. In Hurt, the Ohio Supreme Court determined, "[a]n inference based solely and entirely upon another inference and which is unsupported by any additional fact or another inference from other facts is an inference upon an inference and may not be indulged in by a jury." Id., paragraph one of the syllabus. The Supreme Court further determined, however, that "[a]n inference based in part upon another inference and in part upon facts is a parallel inference and, if reasonable, may be indulged in by a jury." Id., paragraph two of the syllabus. See, also, Motorists Mut. Ins. Co. v. Hamilton Twp. Trustees (1986), 28 Ohio St.3d 13, syllabus. "Because reasonable inferences drawn from the evidence are an essential element of the deductive reasoning process by which most successful claims are proven, the rule against stacking inferences must be strictly limited to inferences drawn exclusively from other inferences." Donaldson v. N. Trading Co. (1992),82 Ohio App.3d 476, 481. (Citations omitted.)
Although a series of inferences arose in this case, none is impermissibly drawn from another. Initially, the inference that defendant wrote the 1998 letter Gill received is based on the fact that the letter was signed with defendant's street name, itself based on Gill's testimony identifying defendant's street name as it appeared on the letter. Whether defendant wrote the rap poem is more tenuous, as it was based on the fact that police obtained the poem from a dwelling containing evidence linking defendant to that dwelling two days after the shooting occurred. That inference, however, is bolstered by additional facts: the testimony of the police handwriting expert that analyzed the handwriting in both documents. Thus, the inference concerning the authorship of the letter and rap poem is a parallel inference based in part on previous inferences and in part on additional facts. Because each of the inferences essential to determining authorship of the letter and rap poem is based on other facts and inferences drawn from those facts, the proof does not violate the prohibition against stacking one inference upon another. Defendant's second assignment of error is overruled.
In his third assignment of error, defendant contends the trial court erred by instructing the jury it could infer defendant intended to purposely kill another from the use of a deadly weapon under the circumstances of this case.
As a preliminary matter, we note defendant failed to object to the jury instructions at trial. Absent plain error, the failure to object to improprieties in jury instructions waives the issue on appeal. State v. Underwood (1983), 3 Ohio St.3d 12, 13. To prove plain error, defendant must demonstrate that, but for the error, the trial's outcome would have been otherwise. State v. Long (1978), 53 Ohio St.2d 91, 97. Additionally, "[n]otice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id. at paragraph three of the syllabus.
Defendant contends the trial court erred when it instructed the jury as follows:
 A person acts purposely when it is his specific intention to cause a certain result. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself, unless he expresses it to others or indicates it by his conduct. Since you cannot look into the mind of another, you must determine purpose from all the facts and circumstances in evidence.
 If a wound is inflicted with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be inferred from the use of the weapon, along with all the other facts and circumstances in evidence. (Tr. 408-409.)
In State v. Getsy (1998), 84 Ohio St.3d 180, 196, certiorari denied (1999), 527 U.S. 1042, the Ohio Supreme Court considered a trial court's jury instruction that "[i]f a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life the purpose to kill may be inferred from the use of the weapon" and whether it created a mandatory presumption in violation of the constitution. The Ohio Supreme Court determined the use of "may" in the instruction indicated the presumption was permissive, not one the jury was required to accept. Id. As in Getsy, the trial court here used "may" in its jury instruction. Based on Getsy, the language the trial court used did not on its face create an impermissible presumption.
Contrary to defendant's contentions, such a determination is not inconsistent with Sandstrom v. Montana (1979), 442 U.S. 510. In Sandstrom, the United States Supreme Court concluded that "* * * whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction." Id. at 514. The language at issue in the Sandstrom jury instruction stated "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts," and was deemed unconstitutional because a jury may have interpreted the instruction as constituting either a burden-shifting presumption or a conclusive presumption. Id. at 513. The permissive language in the jury instruction of this case differs from the language of the jury instruction in Sandstrom, and may not reasonably be interpreted as creating a mandatory presumption.
Defendant further contends that plain error occurred when the language of the jury instruction is combined with the prosecution's closing argument, in which the prosecution stated "[a]gain, if a weapon is used in a matter calculated to destroy life, you may infer intent or purpose from that, and the facts surrounding that event. If you take a weapon out and you are shooting at somebody, what is going through your mind? Of course, you are trying to kill him. This isn't a stick; it isn't a stone. It's a bullet that goes through people, that goes through hot dog stands. It kills. Common sense says you don't shoot at someone unless you are trying to kill them." (Tr. 394.) Defendant's argument is unpersuasive, as the prosecution used "may" in arguing that jurors could infer intent from the fact that defendant used a weapon calculated to destroy life. Such permissive language is consistent with Getsy.
Defendant lastly contends this instruction was improper under the circumstances of this case because intent to kill was not established, given that the shooter fired from a distance, the shooter fired in the direction of a moving vehicle, and the shooter's intended target was not injured.
Defendant's contention is contrary to the well-established doctrine of transferred intent. State v. Ritchey (1992), 64 Ohio St.3d 353, 364. Under the doctrine of transferred intent, "[v]ery simply, `the culpability of a scheme designed to implement the calculated decision to kill is not altered by the fact that the scheme is directed at someone other than the actual victim.'" Id., quoting State v. Solomon (1981),66 Ohio St.2d 214, 218. The evidence here demonstrates that, in the absence of imminent bodily harm to himself, defendant fired a deadly weapon in an urban setting toward a rival gang. Based on the facts and circumstances in evidence, a jury could reasonably conclude defendant acted intentionally with a purpose to kill. See State v. Eley (1978),56 Ohio St.2d 169, syllabus ("A reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt"). Accordingly, defendant's third assignment of error is overruled.
Defendant's fourth assignment of error contends the state presented insufficient evidence that defendant acted purposely as defined in R.C.2901.22(A). Instead, defendant contends the proper charge against defendant should have been involuntary manslaughter based upon the offense of felonious assault. In his brief, defendant claims the present case is devoid of direct proof that defendant intended to take the life of the rival gang members, and further "[l]ogically, such proof can be supplied only through a statement from Appellant." (Defendant's Brief, 24.) Additionally, defendant claims "[t]he gunshots were fired under circumstances in which there was little chance that someone would suffer an injury. * * * Although the two groups were `beefing' at the time of the shooting, their behavior seemed to be limited to `puffing.'" (Defendant's Brief, 25.)
To the extent defendant challenges his conviction as not supported by sufficient evidence, we construe the evidence in favor of the prosecution and determine whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387, unreported. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
Former R.C. 2903.02, in effect at the time of the shooting, provided that no person shall purposely cause the death of another. Under R.C.2901.22(A) "[a] person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
In State v. Robinson (1954), 161 Ohio St. 213, paragraph five of the syllabus, the Ohio Supreme Court found "* * * an intent to kill may be presumed where the natural and probable consequence of a wrongful act is to produce death, and such intent may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound." Moreover, "[t]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence." State v. Brown (Feb. 29, 1996), Cuyahoga App. No. 68761, unreported, appeal granted, 75 Ohio St.3d 1510, dismissed, appeal not allowed, 77 Ohio St.3d 1468. Based on Robinson and Brown, defendant's claim that proof of intent can be supplied only through a statement from defendant is without merit. Accordingly, defendant's fourth assignment of error of error is overruled.
In his fifth assignment of error, defendant contends the trial court violated R.C. 2929.14(E)(4) by imposing consecutive terms of incarceration without making complete findings.
Effective July 1, 1996, Am.Sub.S.B. No. 2 repealed former R.C. 2929.14, which concerned factors for imposition of a fine in felony cases, and replaced it with a revised section dealing with prison terms. In State v. Rush (1998), 83 Ohio St.3d 53, paragraph two of the syllabus, certiorari denied (1999), 525 U.S. 1151, the Ohio Supreme Court determined that "[t]he amended sentencing provisions of Am.Sub.S.B. No. 2 apply only to those crimes committed on or after July 1, 1996." See, also, State v. Raglin (1998), 83 Ohio St.3d 253, 260, certiorari denied (1999), 525 U.S. 1180. Because defendant committed this crime on May 7, 1993, the sentencing provisions of R.C. 2929.14 that apply to crimes committed on or after July 1, 1996, do not apply in this case. Therefore, defendant's claim that improper sentencing by the trial court under R.C. 2929.14(E)(4) is without merit. See State v. Jodziewicz (Apr. 16, 1999), Adams App. No. 98CA667, unreported; State v. Calaway (Mar. 10, 1999), Fairfield App. No. 98-CA-50, unreported; State v. Azan (June 26, 2000), Butler App. No. CA99-02-039, unreported. Accordingly, defendant's fifth assignment of error is overruled.
Having overruled all five of defendant's assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
TYACK and PETREE, JJ., concur.